In the Matter of ALFRED L. BECKER, an Attorney, Respondent.

First Department, March 7, 1924.

**Attorney and client — disciplinary proceedings — attorney suspended for three months for resuming defense of criminal prosecution under circumstances disqualifying him from appearing and for making false statements to court.**

An attorney at law suspended from practice for three months for resuming the defense in a criminal prosecution under circumstances disqualifying him from so appearing as attorney, and for making false statements to the court in regard to material matters under consideration.

DISCIPLINARY proceedings instituted by the Association of the Bar of the city of New York.

---

[*] See Penal Law, § 1142.— [REP.

*Einar Chrystie*, for the petitioner.

*Charles Albert Perkins*, for the respondent.

CLARKE, P. J.:

The respondent was admitted to the bar at a term of the Appellate Division, Fourth Department, in July, 1902. The charge of unprofessional conduct contains two specifications which may be summarized as follows: *First*, that in 1921 respondent resumed the defense of one Joseph Sorro in a criminal proceeding under circumstances which had disqualified him from so appearing. *Second*, that on April 18, 1921, before the Honorable CHARLES C. NOTT, JR., in the Court of General Sessions, and while appearing for the said Joseph Sorro, the respondent made false statements to the court in regard to material matters then under consideration.

On November 24, 1914, Barnett Baff, a West Washington Market poultry man, was shot to death by two assassins. Indictments were found against Joseph Cohen, Abe Graff and others. The indicted persons were not brought to trial by the district attorney. On May 5, 1917, the Governor ordered the Attorney-General to act in place of the district attorney. On May 8, 1917, the respondent, then a Deputy Attorney-General, and Mr. James O'Malley, who was appointed a Special Deputy Attorney-General, were assigned to the charge of the prosecutions. In July, 1917, Joseph Cohen was convicted of the murder of said Baff. One Joseph Sorro was an important witness for the People on said trial. In January, 1919, Sorro made a statement to Assistant District Attorney Pecora to the effect that his testimony upon the Cohen trial was false, said recantation having been sworn to by him before Judge McINTYRE of the Court of General Sessions. In February, 1919, Mr. O'Malley, at Baltimore, examined Sorro, and he substantially reiterated his recantation. On February 18, 1919, Sorro appeared before the respondent and withdrew the recantations theretofore made. John Doe proceedings were begun on March 3, 1919, before Judge McINTYRE acting as a committing magistrate for the purpose *inter alia* of ascertaining the facts in regard to Sorro's alleged perjury. On March 13, 1919, Sorro appeared at the chambers of Mr. Justice TOMPKINS, who had presided at the trial of Cohen, and was told that the judge and the Attorney-General would protect him if he would tell the truth. On May 1, 1919, the respondent resigned as Deputy Attorney-General and resumed private practice. In November, 1919, Sorro was indicted for perjury, committed on the Cohen trial. Mr. John Santora was attorney for Sorro, and on April 3, 1920, the respondent was retained as

15

counsel for Sorro and appeared for him in proceedings in the Court of General Sessions. In January, 1921, an application for a new trial was made on behalf of Cohen, one of the principal grounds being the alleged perjury of Sorro. On February 1, 1921, the respondent was reappointed Deputy Attorney-General, and on the second he filed his oath of office, withdrew as counsel for Sorro, and undertook his assignment to represent the People on Cohen's application for a new trial.

Now representing the State and assigned to the matters growing out of the Baff murder, the respondent, on February 8, 1921, sent a letter to the district attorney requesting the district attorney to turn over to him certain papers, among others all the preliminary statements made to the district attorney by witnesses who were called before the grand jury in connection with the Baff murder, also statements of any other witnesses regarding Sorro's acts taken at the time of the John Doe proceedings and the grand jury investigation, and the minutes of the grand jury relative to Musica, Sorro and Deuel in particular, and to the Baff matters in general. The district attorney replied inclosing the statements of some seventeen witnesses and stating: " Your letters also request copy of the Grand Jury minutes which led to the indictments of Deuel, Musica and Sorro. Inasmuch as a motion was made on behalf of Deuel for an inspection of the Grand Jury minutes, which motion was denied, I question whether we have authority to divulge these minutes without an order of the Court. * * * As the indictments against Deuel, Musica and Sorro are awaiting trial, and as many of the statements which are herewith presented to you relate to proofs which this office will rely upon in the prosecution of those indictments, I take the liberty of asking you to instruct those associated with you to treat those statements as confidential documents of yours and this office."

To this the respondent answered: " Your request that I instruct those associated with me to treat the statements listed in your letter as confidential documents of the Attorney General's and District Attorney's office has been and will be complied with."

Pursuant to an order of the court entered on consent of the district attorney, the grand jury minutes in question were delivered to the respondent, as also a copy of the Sorro recantation made to the assistant district attorney.

On March 23, 1921, the justice before whom the motion for a new trial of Cohen was pending, announced that he would not decide it until after the trial of Sorro for perjury was had. On April 4, 1921, the respondent, to use his own words: " then went back into the Sorro case, so as to protect not only Sorro but also

the interests of the State in maintaining the conviction of Cohen which would be jeopardized if Sorro was convicted. That was the purpose of it. I went back into the case, reassumed charge of it, as a sort of semi-official matter."

On April 6 or 8, 1921, the respondent on behalf of Sorro caused a motion to be made for a special panel of jurors. He was not in court at the time. The assistant district attorney stated to the court his objection to the appearance of respondent in the Sorro case because of his previous activities as a Deputy Attorney-General in the matter of the Cohen motion. The hearing on the motion was adjourned to April eighteenth before Judge NOTT. The assistant district attorney having again stated his reasons for objecting to the respondent's appearance on behalf of Sorro, the respondent said: "It is true that I obtained from the District Attorney's office the statements and the Grand Jury minutes; but it is also a fact that there was not one statement turned over to me which embodied anything whatever in relation to the Sorro case with the exception of Sorro's recantation statement which had already been offered in evidence on the John Doe proceeding and had become public property."

It is conceded that the above statement of the respondent was untrue, and that at that time the respondent was acting as Special Deputy Attorney-General.

The matter was immediately brought to the attention of the grievance committee of the Bar Association by the district attorney. After the hearing before the grievance committee and on May 3, 1921, the respondent withdrew from the Sorro case.

The respondent urges that he earnestly and honestly believed, and still believes, that Cohen was properly convicted of the murder of Baff, and believed that Sorro's testimony upon that trial was true and his recantation, subsequently also recanted, was untrue, and that it was his duty, in order to prevent a miscarriage of justice in the Cohen case, and also in the Sorro case, to defend Sorro; that when on February 28, 1919, Mr. Justice TOMPKINS committed Sorro, at his own request, to the custody of an officer, he stated that it was the Attorney-General's duty to protect Sorro. Mr. Justice TOMPKINS on the hearing of this proceeding testified: "On every occasion I urged him [Sorro] to keep close to the Attorney-General, and to tell the Attorney-General everything that occurred; and assured him that the Attorney-General would defend him, protect him, so long as he told the truth."

And the Attorney-General testified that when the respondent consulted him as to the propriety of defending Sorro: "Mr. Becker asked me if I thought there was any impropriety in his defending

Sorro under such circumstances. We had a long talk about it; and I told him that under all the circumstances as I knew them I not only — I did not see any objection or impropriety in the defense of Sorro, but that I believed it was his duty to do it."

The difficulty with accepting this view of respondent's conduct is that he had requisitioned from the district attorney papers relating to the Sorro case, and notwithstanding the district attorney's objections to surrendering them, had obtained them; and that when the Attorney-General gave him the advice above set forth, he was not advised of this fact. It seems to me that there can be no doubt of the impropriety of a Deputy Attorney-General, by virtue of his office and his official demand, obtaining from the district attorney the evidence upon which a man had been indicted, when the Deputy Attorney-General had been retained and intended to defend that man on that very indictment. This is emphasized by respondent's failure to disclose at the time he obtained the papers his said retainer and intention.

As to the second charge, the respondent frankly admitted before the grievance committee and upon the hearing before the official referee, that his statement to Judge NOTT concerning the papers received by him from the district attorney was untrue — in other words, that the papers turned over to him did in fact contain certain statements having a bearing on the Sorro case. He had made his statements most emphatically, as set forth *supra:* " It is also a fact that there was not one statement turned over to me which embodied anything whatever in relation to the Sorro case with the exception of Sorro's recantation statement." He stated before the grievance committee that when he made the statement he had examined only a few of the statements, and being asked: " What do you say of the propriety of making such a statement as you admit you made, not having read the papers prior to making of such statement to the Court? " He answered: " Of course there is absolutely no defense to that except the one that I acted in good faith. Now I was under the impression, of course, that a list of these statements were [*sic*] contained in the letter, and I was under such an impression — that I knew they were not in any way related to the Sorro Case. Q. You thought you read them over? A. Yes * * * I knew I had seen the letter with the list of statements. This is one of those unaccountable aberrations that sometimes happen."

We have held that " Every judge should be able to rely upon receiving a truthful and frank answer to any question put to an attorney regarding the facts of any case in which the attorney is engaged and is seeking action favorable to his client," and also, " It is just as wrong to assert that a particular statement is true

without knowing whether it is true or false, as it is to assert a thing to be a fact when the person making the assertion knows it to be false." (*Matter of Sachs*, 169 App. Div. 622.)

The learned official referee, in a careful report, has found the respondent guilty of unprofessional conduct as to both charges, and we approve the finding. The respondent's ability and good character have been testified to by judges and lawyers of excellent standing. The Baff murder caused a number of trials, and there was undoubtedly a difference of opinion between the Attorney-General's and the district attorney's offices. We have no doubt that the respondent was actuated by earnest convictions and that his desire to maintain what he believed to be the actual facts led him to take the course that he did. He went too far, we think, in re-entering upon the defense of Sorro, while a Deputy Attorney-General; and we think that his obtaining the papers from the district attorney disqualified him from so acting, and that his statement to the court was unjustifiable. We think that it is a very dangerous practice for any member of the bar who has been connected with the Attorney-General's or district attorney's office engaged in the prosecution of persons charged with criminal offenses to thereafter appear for said defendants in subsequent proceedings of a criminal nature. It would be asking too much of human nature to expect that they could disabuse their minds of that which they had learned during the course of their employment for the People. We cannot overlook the gravity of the question here presented, and while we do not think respondent was wicked or corrupt, we do think that he was over-zealous and careless, and that the interests of justice require that he be suspended from practice for three months, with leave to apply for reinstatement at the expiration of that term, upon proof of his compliance with the conditions to be incorporated in the order to be entered hereon.

DOWLING, SMITH, McAVOY and MARTIN, JJ., concur.

Respondent suspended for three months. Settle order on notice.